Duquesne Light Company *v.* Upper St. Clair Township, Appellant.

324

Argued April 21, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

reargument refused June 4, 1954.

*C. Francis Fisher*, with him *Brenlove & Fisher*, for Upper St. Clair Township, appellant.

*Louis Vaira*, for intervening defendants, appellants.

*John B. Nicklas, Jr.*, with him *McCrady & Nicklas*, for intervening defendant.

*Elder W. Marshall*, with him *Robert F. Banks, Henry G. Wasson, Jr., Walter T. Wardzinski* and *Reed, Smith, Shaw & McClay*, for plaintiff, appellee.

OPINION BY MR. JUSTICE CHIDSEY, May 24, 1954:

These appeals are from the action of the Court of Common Pleas of Allegheny County in awarding a preliminary injunction enjoining the first class Township of Upper St. Clair, Allegheny County, and its officers from enforcing a zoning ordinance against the Duquesne Light Company, a public utility corporation (hereinafter called "Duquesne").

Following the filing on February 23, 1954 of the complaint in equity in which the plaintiff Duquesne sought the injunction against the township, its commissioners and police officer, the defendants named in the suit, a hearing was had on March 5, 1954 and testimony adduced by the complainant. Counsel appeared for the defendants and cross-examined the witnesses called by the plaintiff. On March 25, 1954 the chancellor (Judge Sara Soffel) filed her adjudication granting the prayer of the bill. From the chancellor's findings which are supported by the evidence and not here challenged, the facts may be stated as follows: Duquesne is engaged in the generation, transmission, distribution and sale of electric energy in the City of Pittsburgh and other municipalities in Allegheny, Beaver and Westmoreland Counties. It has construct-

ed and is now operating a power plant known as "Elrama Power Station", located in parts of Beaver Borough, Allegheny County, and Union Township, Washington County, in which energy is generated by two generating units. It has constructed and operates a substation at Woodville, Collier Township, Allegheny County, from which electric energy for light, heat and power is distributed locally and transmitted to other parts of the Duquesne system. The demand for electric energy for light, heat and power has increased in the Woodville area and elsewhere in the Duquesne system during recent years and it is essential that additional energy be transmitted to the Woodville substation to care for the increased demand.

A peak kilowatt load has become imposed upon the system with the result that the generating reserve capacity system is only 1.65% of the installed generating power. The minimum generating reserve necessary to provide adequately for maintenance and breakdowns and to insure adequate service to customers is 10%. Duquesne is presently installing at its Elrama Power Station a third generating unit which is to be completed and placed in operation on September 1, 1954. In order to provide sufficient generating capacity to supply the system's peak load demand and to meet the growing requirements of its system, Duquesne proposed to construct a transmission line between the Elrama Power Station and the Woodville distributing substation. This line passes through seven political subdivisions, two boroughs and five townships, including the Township of Upper St. Clair and Collier Township. The location or site of this proposed transmission line from Elrama to Woodville is the result of the studied judgment of Duquesne's Planning, Engineering, Construction and Right-of-Way Departments. The determining factors in the location of the pro-

posed line were efficiency and economy. The new transmission line will be the principal means of transmitting the output of the new generator at Elrama to Duquesne's 69,000-volt ring transmission system and of supplying the increased demand for electrical energy in the area served by the Woodville substation.

In order to construct the new transmission line it became necessary for Duquesne to acquire by purchase or condemnation rights-of-way and easements over a portion of the defendant Upper St. Clair Township which is zoned residential by a township ordinance. Duquesne does not serve any customers in this township, although it has charter rights to do so, but it owns facilities in the township and serves the public in immediately adjoining communities.

On February 28, 1953 Duquesne filed under the Act of May 21, 1921, P. L. 1057, 15 PS §1182, its individual applications with the Pennsylvania Public Utility Commission praying for a determination that the service to be rendered through the proposed condemnation of rights-of-way and easements on and over ten properties in Upper St. Clair Township was necessary and proper for the service, accommodation, convenience and safety of the public. Subsequently some of the Upper St. Clair property owners whose lands were involved in the applications to the Commission appeared before the Commission's hearing examiner and, while having filed no answer or protests to the applications on their merits, moved for their dismissal for lack of jurisdiction in the Commission to entertain them, averring that (1) Duquesne does not serve nor intend to serve the public in Upper St. Clair with electric energy; (2) the Act of May 8, 1889, P. L. 136, as amended by the Act of 1921, does not authorize the Commission to approve the exercise of the right of eminent domain by an electric light, heat or power

company for use in a township; and (3) Duquesne had failed to aver in its application that it had complied with a certain zoning ordinance enacted by Upper St. Clair.

The hearing examiner denied the motions to dismiss with leave to file formal petitions to the Commission itself for an interim ruling with respect to the jurisdictional issue raised. He then proceeded to take the evidence offered. Thereafter several of the said property owners filed petitions with the Commission requesting an interim ruling on the jurisdictional issue, which were denied by the Commission. Appeals to the Superior Court from this action by the Commission were quashed and this Court on December 18, 1953 refused leave to appeal from the decisions of the Superior Court.

On February 15, 1954 the Commission, acting on, four of the ten applications filed with it by Duquesne, entered orders wherein it determined that the service to be rendered through the proposed condemnation of rights-of-way and easements on and over said four properties was necessary and proper for the service, accommodation, convenience or safety of the public, and certificates of public convenience were issued pursuant thereto. Duquesne has acquired by purchase separate parcels of land and rights-of-way and easements along its proposed line traversing Upper St. Clair Township, including a right-of-way and easement acquired from one J. W. Free in and over his land and the fee in property of Fred K. Becker. On November 17, 1953 and on November 20, 1953, Duquesne, because of the pressing need for electric energy for light, heat and power in the Woodville area and elsewhere throughout its system, and for the completion by September 1, 1954 of the new transmission line contemporaneously with the completion of the third

generating unit at Elrama, commenced work on the Free and Becker properties respectively, looking toward the erection of steel towers thereon for the purpose of carrying the new transmission line. On November 30, 1953 the defendant Klancher, a police officer of the township, was duly authorized by the township authorities to serve and did serve on employes of a contractor engaged by Duquesne and then working on the Free and Becker properties, a notice which read in part as follows: "In compliance with a zoning ordinance set up in the township a Building Permit must be secured, through the office of the Secretary, before any further construction work is herewith permitted. This constitutes a notice of work stoppage, and a fine of $100.00 is assessed the owner or builder for failure to meet these requirements. Each day that a Violation is permitted to exist after this notice has been served shall constitute a separate offense.". Upon receipt of these notices, Duquesne and its contractor stopped working on these properties and have not worked there or elsewhere in the township along the proposed transmission lines. The threat of criminal prosecution contained in the notices, causing the work stoppage, interrupted and prevented and continues to interrupt and prevent the commencement and completion by September 1, 1954 of the proposed transmission line, thus hampering the proper generation and transmission of power from the Elrama Power Station to Duquesne's customers served by the system. Unless the proposed transmission line is completed coincident with the completion of the third generator at Elrama on September 1, 1954, the energy generated by such generator will in large measure be unavailable to the Duquesne system under operating or emergency conditions and thereby Duquesne will suffer large revenue losses and incur added expenses in at-

tempting to provide adequate services to its customers. The chancellor also found that there is urgent need for additional energy in the southern part of Duquesne's system and the situation is expected to grow more serious by the winter of 1954-55 unless the energy generated by the new generating unit at Elrama is transmitted over the proposed transmission line and that unless Duquesne was permitted to resume the construction of the line in and over the township by March 15, 1954, it would not be possible for Duquesne to complete its construction coincident with the completion of the new generator.

The chancellor granted the prayer of the bill and enjoined the defendants from prosecuting or threatening to prosecute the plaintiff for alleged violations of the zoning ordinance or in any way interfering with or preventing the construction of the transmission line.

In the equity proceeding Edward O. Reed and Alberta G. Reed, his wife, owners of property in the township which was the subject matter of one of Duquesne's applications to the Public Utility Commission for approval of its exercise of the right of eminent domain, were allowed by the court below to intervene. They are appellants in the separate appeal to this Court at No. 173 March Term, 1954. In the equity proceeding Duquesne sought to enjoin the township and its officers from interfering with or preventing the further construction of its transmission line. The interest of the appellant Reeds obviously, and as appears from their petition to intervene, was in the efficacy of the zoning ordinance to prevent the construction of the transmission line which as proposed would pass over their property. This is recognized by them in joining in the consolidated brief filed by the appellants in the two appeals, wherein the Statement

of Questions Involved basically presents two questions for our consideration: (1) was Duquesne, a public utility company, subject to the zoning ordinance of the first class Township of Upper St. Clair; (2) did the equity court have jurisdiction to determine the question, and grant the preliminary injunction restraining the enforcement of the ordinance.

As to the first question involved, we are of the opinion that it was properly determined by the chancellor adversely to the appellants. We quote in pertinent part from the chancellor's adjudication:

"Article II, section 1, of the Public Service Company Law of 1913 provided in part that 'It shall be the duty of every public service company . . . to furnish and maintain such service, including facilities, as shall in all respects be just, reasonably adequate, and practically sufficient for the accommodation and safety of its patrons, employees and the public, and in conformity with such reasonable regulations or orders as may be made by the Commission.' Article V, section 2, of the same law provided in effect that if the Public Service Commission should find the service or facilities of any public utility to be inadequate, the Commission should specify what facilities or service should be furnished, and direct the acquisition or rendition of the same. Section 401 of the present Public Utility Code of 1937 (66 PS 1171), which replaced the Public Service Company Law of 1913, provides that 'Every public utility shall furnish and maintain adequate, efficient, safe and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees and the public.' Section 901 of the Code proclaims that 'The Commis-

sion shall have general administrative power and authority to supervise and regulate all public utilities doing business within this Commonwealth.' (66 PS 1341.) Section 413 of the Code requires that if the Commission finds the service or facilities of any public utility to be 'unreasonable, unsafe, inadequate, insufficient, or unreasonably discriminatory, . . . the commission shall determine and prescribe, by regulation or order, the reasonable, safe, adequate, sufficient, service or facilities to be observed, furnished, enforced, or employed, including all such repairs, changes, alterations, extensions, substitutions, or improvements in facilities as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public, and shall fix the same by its order or regulation.' (66 PS 1183.) The Public Utility Code also imposes a fine of $50.00 for each day that a public utility fails to perform its statutory duties (66 PS 1491), and imposes criminal penalties upon any corporation or person failing or refusing to comply with any order of the Commission. (66 PS 1492.) Finally, the Act which created the Public Utility Commission imposes upon it a duty to administer and enforce the Code. (66 PS 462 (a).)

*"The First Class Township Law Upon Which Upper St. Clair Relies Provides That It Shall Not Modify the Public Utility Code.* In 1931, six years before the enactment of the Code and while the Public Service Company Law of 1913 was in effect, the General Assembly enacted the existing First Class Township Law. Section 3101 of the latter statute granted general zoning power to first class townships (53 PS 19092-3101), but, significantly, Section 3502, as initially enacted (53 PS 19092-3502), expressly provided that the act should 'not repeal or modify any of the provisions of the Public Service Company Law' of

1913. In 1949, Section 3502 of the First Class Township Law of 1931 was amended to provide that the statute was not to 'repeal or modify any of the provisions of the Public Utility Law' of 1937 (53 PS 19092-3502). Thus, long before first class townships ever acquired any zoning powers, the General Assembly had clearly expressed the policy of the Commonwealth to commit the regulation of public utilities to a commission of state-wide jurisdiction, and to impose a duty upon utilities to render adequate and efficient service and to make such changes in or extension of their facilities and service as might be necessary to accommodate or serve the public. That policy remains deeply embedded in the present Public Utility Code and is the law of Pennsylvania.

*"The First Class Township Law Does Not Expressly or Impliedly Grant Such Zoning Power with Respect to Uses and Structures, Other Than Buildings, of a Utility Company.* The First Class Township Law does not *expressly* confer power upon townships to regulate public utilities by zoning ordinance, with respect to uses and structures, other than buildings. Nevertheless, Upper St. Clair argues that the First Class Township Law *impliedly* confers power upon townships to regulate public utilities with respect to uses and structures. It relies upon Section 3110 of the law. That section provides (53 PS 19092-3110) : 'This article (i.e., the article conferring zoning power upon first class townships) shall not apply to any existing or proposed building, or extension thereof, used or to be used by public service corporations, if, upon petition of the corporation, the Public Utility Commission shall, after a public hearing, decide that the present or proposed situation of the building in question is reasonably necessary for the convenience or welfare of the public.' Upper St. Clair points out that

Section 3110 does not mention uses or structures, such as a transmission line. It argues that since buildings alone are exempted, under certain conditions, from the general power to zone, the *inference* is that uses and structures other than buildings are subject to that power. With this contention we do not agree. Further, the statute expressly and unequivocally declares that a township shall *not* modify the Public Utility Code. Now, if a first class township by zoning ordinance can exclude a utility entirely from within its borders, or can dictate where structures of the utility shall be erected or how they may be used, it then most certainly is enabled to (1) regulate the utility, and (2) make it impossible for the utility to perform its statutory duty of rendering adequate and efficient service. Thus, if the zoning article of the First Class Township Law were construed as Upper St. Clair would have it construed, that construction would modify the Code in these respects: (1) First class townships, together with the Commission, and not the Commission alone, would regulate public utility companies; and (2) public utility companies would render adequate and efficient service unless they were prevented from doing so by zoning ordinances of first class townships. Section 3110 merely grants an *express power* (not contained at all in the section granting general zoning power) to zone with respect to buildings of a public utility company, subject to a determination by the Commission that the present or proposed location of such buildings is not reasonably necessary for the convenience of [or] welfare of the public. This construction in no way modifies the Code, for it can be seen that the Commission—the regulatory body under the Code is entrusted with the vital determination of *necessity*. We therefore conclude that the policy of the Commonwealth in entrusting to the Commission the

regulation and supervision of public utilities has excluded townships from the same field, and that no power in townships to enter that area can be read into the First Class Township Law *by implication.* Unless the legislature has given an *express* grant of power to townships, the Commonwealth's own expressed policy on the subject is undiminished and supreme. We have been unable to find any case in Pennsylvania involving the question of whether a political subdivision can regulate a public utility company by a zoning ordinance. The instant case seems to be one of first impression. We know of no instance in Pennsylvania where local authorities have contended that the uses and structures of a public utility could be controlled by the application of a local zoning ordinance. Counsel for the plaintiff has cited two cases in other jurisdictions which affirm the basic principle that in event of a conflict between a local zoning law and a statute, the zoning law must give way. See *Jewish Consumptive's Relief Soc. v. Town of Woodbury,* 243 N. Y. Supp. 686 (1930), aff'd. 177 N .E. 165 (1931) and *Jennings v. Connecticut Light & Power Co.,* (Conn. Sup. Ct. Err. 1954). In the absence of a clear expression of intent on the part of the legislature to authorize a municipal subdivision by zoning ordinance to regulate a public utility, no such power can be implied. The Public Utility Code demonstrates without question that the Legislature of the Commonwealth of Pennsylvania has therein expressed its policy to commit the regulation of utilities to the Public Utility Commission and to impose a duty upon utilities to render efficient service. It is clear that the proposed transmission line is necessary for the rendition of efficient service to the public and that that necessity transcends the legitimate objectives of any one of the political subdivisions of the Commonwealth. We be-

lieve that this is the reason why the General Assembly entrusted the regulation of public utilities to a commission of state-wide jurisdiction. Local authorities not only are ill-equipped to comprehend the needs of the public beyond their jurisdiction, but, and equally important, those authorities, if they had the power to regulate, necessarily would exercise that power with an eye toward the local situation and not with the best interests of the public at large as the point of reference. We believe that the General Assembly never intended to bestow a power upon first class townships which is in headlong conflict with the power already given the Public Utility Commission. We believe that the General Assembly never gave any one of the political subdivisions through which the proposed line will pass the power to determine whether the public in another locality shall be served with electric energy, or the means by which they shall be served. It is our conclusion that the Zoning Law of Upper St. Clair Township is invalid and void as applied to Duquesne Light Company.".

Any other conclusion than that reached by the chancellor would render the Public Utility Commission powerless to regulate the functioning of an electric service company if in so doing the Commission contravened any regulation or order of a local zoning authority. If the power of the municipality were held paramount, the Commission could not compel the utility to provide adequate service or in anywise control the expansion or extension of the utility's facilities if an order of the Commission conflicted with action taken by any political subdivision of the State. This would mean the complete negation of the powers of regulation and control specifically given as a matter of public policy to the Public Utility Commission in the interest of state-wide public welfare. By the Act

of 1921, supra, the Legislature has specifically provided that before a public service corporation engaged in supplying light, heat and power may proceed with the right of eminent domain (granted it by the Act of May 8, 1889), it must first obtain the approval of the Public Utility Commission of the exercise of the right. The function of the Commission as stated in the Act is to determine whether the exercise of the right of eminent domain is necessary or proper for the service, accommodation, convenience or safety of the public. If the Commission determines that it is, it issues a certificate of public convenience.

An order of the Public Utility Commission typical of the other orders entered after hearing in the four applications made by Duquesne was introduced in evidence at the hearing in the equity proceeding. The order shows that the issuance of the certificate of public convenience pursuant thereto was predicated upon the approval of the location of the transmission line, following consideration of alternate routes and determination that the proposed route was the most feasible. The law does not provide or require that there be an initial approval by the Commission of the proposed extension of a facility by a utility company before it embarks upon its undertaking. The voluntary expansion or extension of its facilities lies in the discretion of company management. To the extent, however, that it is compelled to acquire property or rights or easements therein through condemnation, it must establish necessity therefore if the latter is questioned. In *Boalsburg Water Company v. State College Water Company*, 240 Pa. 198, 87 A. 609, this Court at p. 212 said: ". . . The condemning company clearly has the right to condemn so much water as may be necessary not only for present purposes but for future needs. As applied to railroad companies this has been decided many

times and the same rule should prevail as to water companies, except as it may be modified by the character of the thing condemned and the necessities of the use. The condemning company must determine in the first instance what its necessities are and what volume of water should be condemned for its corporate purposes. . . . It is therefore incumbent on the condemning company to decide in the first instance the amount of water deemed necessary to be condemned for its use. This does not mean that the act of the water company in this respect is final and conclusive upon all parties. Indeed, the very opposite is true, because the question of necessity may always be inquired into by a proper proceeding in the courts. . .".[1] The foregoing language is equally applicable to a public utility company supplying light, heat and power which enjoys the right of eminent domain. The *Boalsburg* case was decided before the enactment of the Public Service Company Law of 1913, and now under the Act of 1921, supra, approval by the Public Utility Commission of the exercise of the right of eminent domain by a public utility supplying light, heat and power must first be obtained. However, the principle that the extension of its facilities is primarily a mat-

---

[1] It may be noted that on the question of necessity, we said in *Fayette County Commissioners' Petition*, 289 Pa. 200, at p. 207: ". . . 'Under a delegation of the power of eminent domain the grantee of the power, in the absence of legislative restriction, may determine the location of the land [to be] acquired, and such determination will not be interfered with by the courts if it is made in good faith and is not capricious or wantonly injurious, or in some respect beyond the privilege conferred by the charter or statute. The landowner cannot raise the objection that there is no necessity for condemning the property because some other location might be made': 20 C. J. 632; Biddle v. Wayne Water Works, 190 Pa. 94 . . .". And see *Schenk v. Pittsburgh et al.*, 364 Pa. 31, 36.

ter for the discretion of its management still obtains.

It is true, as appellants assert, that it has been held that the approval of the Commission is only a preliminary step and the scope and validity of the particular condemnation proceeding remains for subsequent determination.[2] But this does not justify the enforcement of a zoning ordinance if, as the chancellor in the instant case properly determined, such ordinance is invalid and void as applied to the utility company.

Appellants do not here challenge the approval of the Commission of the location of the transmission line. As before stated their contentions are, first, that the utility company is subject to the zoning ordinance and, second, that the equity court had no jurisdiction to intervene in the matter.

Passing to the latter contention, appellants claim that the zoning statute under which its ordinance was adopted provides the exclusive remedy by which the rights of Duquesne might be adjudicated. As a general rule no one is entitled to relief in a court of equity for threatened injury until available remedies at law are exhausted, and our appellate courts have held that under Section 13 of the Act of March 21, 1806, P. L. 558, 46 PS §156, which provides that "In all cases where a remedy is provided, . . . by any act or acts of assembly . . . the directions of the said acts shall be strictly pursued, . . .", the remedy provided must be employed: see e.g. *Lukens v. Ridley Township Zoning Board of Adjustment,* 367 Pa. 608, 80 A. 2d 765; *Commonwealth v. DeBaldo,* 169 Pa. Superior Ct. 363, 82 A. 2d 578. But the exhaustion doctrine will not be

---

[2] *Reiber et al. v. Public Service Commission,* 83 Pa. Superior Ct. 507; *Wilson v. The Public Service Commission,* 89 Pa. Superior Ct. 352; *Pittsburgh Railways Co. et al. v. P. S. C. et al.,* 115 Pa. Superior Ct. 58; *Dickel v. Bucks-Falls Electric Co.,* 306 Pa. 504.

applied nor will a party be relegated to a legal remedy if the legal remedy is not adequate and complete or if its pursuit would work irreparable harm; in such case equity has jurisdiction and will afford relief: *Wood et al. v. Goldvarg,* 365 Pa. 92, 74 A. 2d 100.

The evidence was undenied that unless construction of the transmission line were resumed by March 15, 1954, Duquesne would be unable to complete it by September 1, 1954, the day on which the third generator now being built at Elrama is expected to be put into service. There was likewise uncontradicted evidence that if the transmission line is not completed by September 1, 1954, Duquesne will be forced under various conditions to use less efficient equipment or to curtail service to its customers, at a cost or loss to it of from $150 per day to $350 per hour. Under the administrative procedure provided by Section 3107 of the zoning statute of June 24, 1931, P. L. 1206, as amended, 53 PS §19092-3107, the Board of Adjustment fixes a reasonable time for the hearing of an appeal, must give public notice thereof as well as due notice to the parties in interest and decide the same within a reasonable time, and any party aggrieved by the Board's decision has 30 days in which to appeal to the county court. Patently such time-consuming procedure would cause Duquesne irreparable financial harm, without taking into consideration the interests of the public.

As stated by the chancellor: "There are thirty properties in Upper St. Clair which will be used in the construction and maintenance of the transmission line in that township. The ordinance imposes a fine of $100.00 per day for each day that work is performed in violation of the ordinance. Thus, it is entirely possible that since Upper St. Clair already has served two notices respecting the Free and Becker properties, it

would take the position that if Duquesne worked on all thirty of the properties in any one day, in violation of the ordinance, there would be thirty violations and hence a fine of $3,000.00 per day. That penalty would swell at the rate of $3,000.00 for each day that Duquesne continues with the construction and maintenance of the transmission line, while waiting for Upper St. Clair's administrative machinery to grind out an appealable order, or for a test case on the criminal side to run its course.".

In *Adams v. New Kensington,* 357 Pa. 557, 55 A. 2d 392, Justice, now Chief Justice Horace Stern, at pps. 560, 561 said: "It is elementary that an injunction will not be granted to restrain criminal prosecutions on the mere ground that the statute or ordinance on which the prosecution is based is, for any reason, unenforceable, since the party has an adequate remedy at law; he may establish at trial, by way of defense, the invalidity of the legislative enactment. But equity does have jurisdiction to enjoin such a prosecution where it is alleged not only that the statute or ordinance is unconstitutional and void but that its enforcement would cause the plaintiff irreparable loss to his property, either by effecting, if not a total suppression of his business, at least a grave interference therewith, or by subjecting him to the imposition of cumulative, exorbitant and oppressive penalties pending judicial determination of the validity of the legislation. . .". And see *Meadville Park Theatre Corporation v. Mook et al.,* 337 Pa. 21, 29, 10 A. 2d 437. We are of the opinion that under the circumstances here presented the chancellor correctly held that the pursuit of the administrative remedy would result in irreparable harm to the utility. We conclude that the equity court had jurisdiction and properly issued the preliminary injunction.

We have considered all of the contentions by the appellants and find them without merit.

The decree is affirmed, the costs of this appeal to be paid equally by the township and the Duquesne Light Company.

Mr. Justice MUSMANNO dissents.