## Commonwealth v. Bove

*Paul B. Greiner*, for Commonwealth.
*Daniel Brahaney*, for defendant.

TRAMBLEY, P. J., August 28, 1957.—This case is before the court on appeal of John Bove, the above-named defendant, from a judgment of guilty by a justice of the peace on a charge of violating an ordinance of the Borough of Ridgway in that he was: "Unlawfully keeping and maintaining a slaughter house, also chickens, rabbits and horse or horses on his property contrary to Ordinance number 343, section 3, paragraph f, which pertains to the general sanitation of the Borough of Ridgway."

On October 8, 1951, the Borough of Ridgway enacted and adopted its Ordinance 320 creating a board of health and a health officer for the Borough of Ridgway, fixing the number of the members of the board of health, the manner of their appointment, their terms of office, etc., providing for an organization of the board, its powers and duties, establishing regulations regarding certain public eating and drinking places, general sanitation and communicable diseases and providing penalties for the violation thereof.

Section 1 of the Ordinance reads as follows:

"Section 1. Board of Health and Health Officer:

"That a Board of Health and office of Health Officer of the Borough of Ridgway is hereby created to be governed and regulated and with the powers and responsibilities agreeable to the provisions of an Act of Assembly of the Commonweatlh of Pennsylvania, approved May 4, 1947, P. L. 519, as amended and supplemented."

The citation of this act should have been the Act of May 4, 1927, P. L. 519.

On March 19, 1956, the Borough of Ridgway enacted and adopted its Ordinance 343, being an amendment of Ordinance 320. This Ordinance amends sections 1(e) 1 and 3 of Ordinance 320 by further setting forth the duties of the health officer and making further

provisions in regard to general sanitation in the Borough of Ridgway.

Defendant is charged specifically with violating section 3, paragraph (*f*) of Ordinance 343 which reads as follows:

"It shall be unlawful for any person, firm or corporation or any agent thereof to keep or maintain in the Borough the following: Slaughter houses, hogs, chickens, rabbits, cows, horses, goats, turkeys, geese, parrots or other domestic farm and wild animals livestock or fowl, all tropical birds, including parakeets, either raised in this country or imported, unless properly certified as free of psitcacosis; excepting commercial enterprises existing at the time of enactment of this amendment and from which the owner derives a substantial portion of his livelihood, and provided that such existing commercial enterprises are continuously maintained in a manner as not to create a nuisance, and further provided that there will be no expansion whatever of such existing enterprises."

On October 19, 1956, I. J. Meenan, Ridgway Health Officer made information before a justice of the peace charging defendant with violating section 3 (*f*) of Ordinance 343. A warrant for his arrest was issued on the same day and at a hearing before the justice of the peace on October 25, 1956, defendant was found guilty as charged and fined $5 and costs. From this conviction defendant has appealed to the court of quarter sessions of this county.

### Findings of Fact

From the evidence offered in this case the court finds the following facts:

1. That the Borough of Ridgway duly adopted the above mentioned Ordinance 320 on October 8, 1951, and that it duly adopted the above mentioned Ordinance 343 on March 19, 1956.

2. That said Ordinance 320 establishes a board of health and health officer for the Borough of Ridgway and prescribes certain rules and regulations for the guidance of the same and penalties for the violation of such rules and regulations.

3. That Ordinance 320 erroneously cited its authorization as the Act of May 4, 1947, P. L. 519, instead of the Act of May 4, 1927, P. L. 519.

4. That Ordinance 343 is an amendment of Ordinance 320 and, inter alia, prohibits the keeping or maintaining of slaughter houses, chickens, rabbits, horses, in the Borough of Ridgway, except commercial enterprises as above set forth.

5. That John Bove is and has been for many years a citizen and resident of the Borough of Ridgway and owns certain real estate, about eleven acres, in the borough.

6. That said John Bove has raised rabbits and chickens commercially on his premises since about 1940 and has leased to his son-in-law stalls for two horses since sometime in 1955.

7. That the said John Bove kills and dresses chickens and rabbits on the premises and sells them to various persons and that the income from these sales and the renting of stables for the horses constitute a substantial portion of his income.

8. That he applied for a permit to build the stable for the horses and paid the fee and was told by a member of the Ridgway Borough Council to go ahead and erect the building although he had not yet received a permit and never did receive it.

9. That sometime after the said member of council told him to go ahead and erect the building he was told to stop but the building was completed at that time.

10. That the Borough of Ridgway did not pursue its remedy under the building ordinance when it is alleged defendant violated it.

11. That John Bove permitted the neighbors' children to ride the horses sometimes.

12. That horse manure was seen on the paved streets of Ridgway by at least one witness and on alleys near the Bove property by others but the witnesses did not know the source of same.

13. That there is, at times, a smell of horses emanating from the Bove premises.

14. That horses can carry tetanus germs but the probability that they will do so is rare and there is no evidence that the horses here involved did so.

15. That horses can be kept in the borough so as not to be detrimental to health.

16. That, if any, the only inconvenience suffered by anyone because of the keeping of rabbits, chickens and horses by Mr. Bove and the slaughtering of the chickens and rabbits is that at times when the wind blows in a certain direction there is a smell of horses at some places in the vicinity of the Bove property and there is also a smell in the vicinity of the Bove property which arises from puddles of stagnant water which gather in certain places nearby, not due to defendant's activities.

17. That none of defendant's witnesses, at least one of whom lives closer to the Bove property than several of Commonwealth's witnesses who testified to the odor of horses, ever smelled the odor of horses.

18. That the nearest dwelling to the chicken coop and stable is 125 feet distant from the Bove property.

19. That there is no evidence that the building in which the various animals were housed was kept in an unsanitary manner.

20. That the keeping and maintaining of the chickens, rabbits and horses in a borough is not a nuisance per se and the evidence does not establish that it was a nuisance in this case.

21. That the typographical error in citing the statute under which this Ordinance is enacted does not affect the validity of the ordinance.

22. That the Ordinance, insofar as it prohibits the keeping of chickens, rabbits and horses within the borough, is unreasonable, arbitrary and prohibitive instead of regulatory, is not a regulation necessary for the comfort, convenience and safety of the residents of the Borough of Ridgway and is, therefore, to this extent unconstitutional and void.

### Discussion

The Borough of Ridgway cites as evidence of the wide power granted by the legislature to boroughs and as its authority for enacting this ordinance the granting of certain specific powers for regulating cesspools, drains, manure, compost, plumbing, garbage plants, carrying on of any manufacture, art, trade or business, which may be noxious or offensive to the inhabitants, the right to prohibit the keeping of hogs within the borough or within any part of the borough and especially section 40 of the Act of July 10, 1947, P. L. 1621, 53 PS §46217, which authorizes boroughs to make such regulations as may be necessary for the health, safety, morals, general welfare and cleanliness and the beauty, convenience, comfort and safety of the borough.

Specifically, under the general welfare clause, or by virtue of a general grant of power, municipal corporations are authorized to enact appropriate and reasonable ordinances, to abate nuisances and regulate various kinds of occupations that may become nuisances or detrimental to the public health. By the organization of a city or borough within its borders, the State imparts to its creature, the municipality, the powers necessary to the performance of its functions, and to the protection of its citizens in their persons and property. The police power is one of these. Ordinances of

cities and boroughs, passed in the legitimate exercise of this power, are therefore valid. Of course, any restriction imposed by such an ordinance on the use of property must be reasonably conducive to the safety, health, morals or general welfare of the public, for the exercise of the police power is always subject to judicial review and a law based upon it must not be patently beyond the necessities of the case but must bear some rational relation to the end to be attained: Samuels v. City of Beaver Falls, 5 D. & C. 2d 500, 506, 507; Bryan v. City of Chester, 212 Pa. 259, 61 Atl. 894; Manorville Borough v. Flenner, 286 Pa. 103, 133 Atl. 30, affirming 87 Pa. Superior Ct. 84; White's Appeal, 287 Pa. 259, 134 Atl. 409; Harris v. State Board of Optometrical Examiners, 287 Pa. 531, 536, 135 Atl. 237, 239; Commonwealth v. Zasloff, 338 Pa. 457, 460, 13 A. 2d 67, 69. See also Everett v. Harron, 380 Pa. 123; Duquesne Light Co. v. Upper St. Clair Township, 377 Pa. 323; Boggs v. Werner, 372 Pa. 312.

It will be noted that among the above enumerated powers given to boroughs the statute does not specifically authorize the borough to prohibit the keeping of any animals in the borough with the single exception of hogs. Boroughs have no power other than that which is given them specifically by statute or which must be necessarily implied from the powers specifically given. For instance, if a borough is given the right to pave its streets it must necessarily be implied, although it is not so stated in the statute itself, that it would have the right to do the necessary grading, purchase the necessary materials, enter into the necessary contracts, etc., to do such paving. So, if a borough is given power to take such action as it deems necessary for the health, safety, morals, general welfare and cleanliness and the comfort, convenience and safety of its citizens it must be implied that the bor-

ough is given the power to take such action as is reasonably necessary to exercise this power.

While the tribunal which determines the proper exercise of this power is in the first instance the legislature, the ultimate decision rests with the courts. If, after investigating, there is a doubt as to whether the statute is enacted for a recognized police object, or if, conceding its purpose, its exercise goes too far, it then becomes the judicial duty to declare the given exercise of the police power invalid: White's Appeal, 287 Pa. 259, 264; Nolan v. Jones, 263 Pa. 124, 127; Miller v. Los Angeles, 195 Cal. 477, 234 Pac. 381; Walls v. Midland Carbon Co., 254 U. S. 300.

The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police power is not final or conclusive, but is subject to the supervision of the courts: Lawton v. Steele, 152 U. S. 133, 137. The power of judicial investigation does not concern itself with the wisdom of the policy emanating from the legislative branch, or whether the best of all possible means of achieving the desired result has been selected. It is concerned only with the questions of whether the statute has a recognized police purpose, and whether it has a reasonable relation to the object to be attained: White's Appeal, supra.

Generally, the right concerns, as here, property and rights issuing out of it. No matter how seemingly complete our scheme of private ownership may be under our system of Government, all property is held in subordination to the right of its reasonable regulation by the Government clearly necessary to preserve the health, safety or morals of the people. Obedience to such regulation is not taking property without due

process; that clause does not qualify the police power. Property is held under the implied obligation that the owner shall use it in such way as not to be injurious to the community: White's Appeal, supra; C. B. & Q. Railway Co. v. Drainage Commissioners, 200 U. S. 561; Salem v. Maynes, 123 Mass. 372.; In re Cherry, 201 App. Div. (N. Y.) 856, 193 N. Y. S. 57; Windsor v. Whitney, 95 Conn. 357, 111 Atl. 354.

The Act of 1927, P. L. 519, as amended by the Act of 1947, P. L. 1621, sec. 40, does not give the borough the power or authority to prohibit the keeping of any animal, except hogs, within any part of the borough. This indicates that the legislature did not intend to give the borough the power to arbitrarily prohibit the keeping of any other animals within the borough. Therefore, it could only do so where it is necessary for the welfare, health, safety and comfort of the community, as the right to arbitrarily prohibit the keeping of pigs in the borough certainly does not by implication give the right to arbitrarily prohibit the keeping of other animals. If the legislature had intended this it could very easily, and no doubt would, have added the names of such other animals to the section of the statute cited. Indeed, we are led to the conclusion that, by only naming hogs, the borough is denied the right to arbitrarily prohibit the keeping of other animals within its borders.

In other words, the specific mention of hogs in the statute indicates a limitation of the power of the borough to arbitrarily prohibit the keeping of other animals therein, and that the keeping of other animals can only be prohibited when it constitutes a nuisance. It means that the borough may under section 40 of the Act of July 10, 1947, P. L. 1621, 53 PS §46217, make such rules and regulations for the keeping in a proper and sanitary manner of animals, other than hogs, as

are necessary for the health, safety and comfort of the members of the community as it deems necessary, but that such rules and regulations must be fair and reasonable, not arbitrarily prohibitive or confiscatory and must have a reasonable relation to the purpose or object to be obtained. Such rules and regulations must not arise from a desire to resist the natural operation of economic laws or for purely aesthetic consideration; White's Appeal, supra; Welch v. Swasey, 214 U. S. 91; Coppage v. Kansas, 236 U. S. 1, 18; Boyd v. United States, 116 U. S. 616, 635; St. Louis Poster Advertising Co., v. St. Louis, 249 U. S. 269; Cooley on Constitutional Limitations, 768.

The same principles apply to slaughter houses. The borough has no right or power to prohibit them unless they are so conducted as to be nuisances: Commonwealth v. Brann, 81 Pa. Superior Ct. 38; Kanig's Appeal, 56 D. & C. 53.

Our forefathers came to America seeking liberty, liberty of thought, of speech, of religion, and of freedom from interference with their property or lives. This historical origin and development of our Country and the rights, privileges and immunities guaranteed by our Constitution, some of which are apparently little known, are ofttimes forgotten.

It was probably for this reason that our Supreme Court in the leading case of White's Appeal, supra, reviewed, inter alia, the power of a State to take or regulate the use of private property. The court said in part:

". . . all property is held in subordination to the right of its reasonable regulation by the government *clearly* necessary to preserve the health, safety or morals of the people. . . . There is one matter that is quite certain, the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable in-

termeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety and general welfare. . . . While such regulations may not physically take the property, they do so regulate its use as to deprive the owner of a substantial right therein *without compensation*. 'We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change': Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 416. . . . 'To secure their property was one of the great ends for which men entered society. The right to acquire and own property, and to deal with it and use it as the owner chooses so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural liberty—an expression of his freedom—guaranteed as inviolate by every American bill of rights': Spann v. Dallas, 111 Tex. 350, 235 S. W. 513. . . . Each case must of course be decided on its own facts. . . . Where a statute or ordinance interferes with the use and control of property without rational relation to public safety, health, morals or general welfare, or is a palpable invasion of rights secured by the fundamental law, the enactment cannot be sustained as a legitimate exercise of police power. . . . To bring this, and other like regulations, under the police power, would be to sweep away constitutional guarantees on the ownership of property. It is regulation run mad." (Italics supplied.)

In a democracy, the sovereign is always alert and careful with regard to the rights, liberties and properties of its citizens. It realizes that power misplaced may be power disgraced, that on many occasions there have been great abuses of power by those to whom it has been delegated, many times intentionally, more

frequently because the powers given were not precisely delimited or defined. It is for this reason that the legislature in creating municipalities outlines their powers with as much particularity and definiteness as possible. It is also the reason for the rule that statutes delegating powers to municipalities must be strictly construed and nothing read into them which is not set forth therein or cannot be fairly implied from the wording of the statute giving the specific powers. For instance, the powers given to boroughs to, by ordinance, prohibit the keeping of hogs in the borough would by necessary implication carry with it the right of the borough to enforce such ordinance by fine, imprisonment or otherwise although the power is not specifically mentioned in that portion of the statute.

On the other hand, legislatures do not wish to so limit the powers of municipalities that they cannot properly perform their duties so that a final clause, more general, and at first glance more liberal in terms, is usually included in the statute delegating powers. These apparently more liberal provisions call for the use of sound reason, good judgment and common sense to a greater degree than the specific powers given because such clauses are so general in their terms. It is these latter clauses which most often cause the greatest difficulty in construction and interpretation as ordinances based on them must be passed and the power delegated to the borough must be further delegated to the particular officer whose duty it is to carry them out and who, in the first instance, must construe the ordinance.

An owner of property in Pennsylvania is still entitled to certain unalienable constitutional rights of liberty and property. These include a right to use his own home in any way he desires provided he does not (1) violate any provisions of the Federal or State Constitution; or (2) create a nuisance; or (3) violate any

covenant or easement; or (4) violate any police regulations which are constitutional: Lord Appeal, 368 Pa. 121, 125.

It is well settled that ordinances passed by boroughs with references to the health and sanitation of the citizens thereof are valid and constitutional whenever they are necessary for the preservation of public health, safety, morals or general welfare, and not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property: Lord Appeal, supra; White's Appeal, supra; Taylor v. Moore, 303 Pa. 469; Kline v. Harrisburg, 362 Pa. 438, 451; Jennings' Appeal, 330 Pa. 154; Ward's Appeal, 289 Pa. 458; Bryan v. City of Chester, 212 Pa. 259; Taylor v. Haverford Township, 299 Pa. 402; Perrin's Appeal, 305 Pa. 42; Village of Euclid v. Ambler Realty Co., 272 U. S. 365; Penna. Coal Co. v. Mahon, 260 U. S. 393; St. Louis Poster Adv. Co. v. St. Louis, 249 U. S. 269; Eubank v. Richmond, 226 U. S. 137.

Restrictions imposed by ordinances are, however, in derogation of the common law and, at times, of the liberties, rights and privileges guaranteed by the Constitution of the United States and the Constitution of Pennsylvania and, therefore, must be strictly construed: Lukens v. Ridley Township Zoning Board of Adjustment, 367 Pa. 608; Kline v. Harrisburg, 362 Pa. 438, 451; Lord Appeal, 368 Pa. 121, 126.

The Borough of Ridgway, therefore, had no power to arbitrarily prohibit the maintaining of a slaughter house or the keeping of horses, chickens or rabbits in the borough as the statute gave it no such power. The statute did, however, give it power to ordain such regulations as might be or become necessary for the safety, health, comfort and welfare of the community, provided such regulations bear some rational re-

lation to the public safety, health, morals or welfare and are not arbitrary or confiscatory.

The evidence in this case does not in any way indicate that the slaughter house was maintained or the chickens or rabbits kept and slaughtered and dressed in an unsanitary manner nor that they were in any way detrimental to the health, safety, comfort, morals or welfare of the community.

As a matter of fact, most of the testimony offered by the borough referred to the horses kept on his premises by defendant. The gist of the borough's evidence in regard to the horses is that they can carry tetanus germs but that they rarely do so and that they can be kept in a sanitary manner so as not to be a hazard or menace to the health, comfort or safety of the community. There was no evidence offered to show that they were not so kept except that some of the witnesses testified that there was a smell arising in the barn where the horses were kept and also that there was manure on at least one paved street and on some of the alleys near the barn.

There was a decided conflict between the testimony of the borough's witnesses and defendant's witnesses as to whether or not any smell was caused by the presence of horses on defendant's premises. At least one of defendant's witnesses who lived much nearer than some of the borough's witnesses, stated that he did not smell any odor coming from the horses. There was also testimony that a bad odor arose from puddles of water which became stagnant in the alley or street near defendant's premises. Inasmuch as the statute authorizing the creation of a board of health and a health officer is in derogation of the common law it must be strictly construed and as defendant is charged with the violation of this ordinance, the maintaining of a nuisance on his premises must be estab-

lished beyond a reasonable doubt. In view of the conflicting testimony offered in this case and of the knowledge of people generally that heretofore many horses have been kept and livery stables maintained in boroughs which apparently were not a menace or detrimental to the health, safety, welfare and comfort of the community, we conclude that the borough has not established beyond a reasonable doubt that defendant was guilty of maintaining a nuisance on his premises.

There is also another reason for sustaining defendant's appeal which is that under section (f) commercial enterprises existing at the time of the enactment of this amendment and from which the owner derives a substantial portion of his livelihood, are excepted from the operation of the ordinance, provided that such existing commercial operations are continuously maintained in a manner as not to create a nuisance, and further provided that there would be no expansion whatever of such existing enterprises.

Defendant contends that his income from his rabbit and chicken business and from renting the barn for the horses amount to about 40 percent of his income. The borough questions that the income from these activities do constitute 40 percent of defendant's income. The ordinance merely says a substantial portion of his income so that even if the income which defendant derives from these activities be only 20 percent it would still be a substantial portion of his income in the opinion of this court and defendant could not, therefore, be held guilty of violating this ordinance unless he conducted this business in such a manner as to create a nuisance which, as we have set forth above, this court does not believe the borough has proven.

What the court said in the recent case of the Commonwealth v. Christopher, reported in 184 Pa. Supe-

rior Ct. 205, 211, is pertinent here: "What the legislature intended to grant to second class townships was the power to prohibit nuisances or offensive businesses, expressly to be declared as such in an ordinance, and not the power to abolish a lawful business conducted in such manner as to amount to a nuisance".

The legislature gave the boroughs power to prohibit and remove nuisances, also to prohibit within the borough the carrying on of any manufacture, art, trade or business which may be noxious or offensive to the inhabitants. It did not define such manufacture, etc., as nuisances per se, but, rather, gave authority to local municipalities, *based upon actual conditions*, to so declare such activities. The ordinance in question did not do this but prohibited or made unlawful that which was lawful prior to the enactment: Commonwealth v. Christopher, supra.

Appellant has raised the question as to whether the ordinance is invalid because of the typographical error which resulted in setting forth in the ordinance that the date of the enabling statute was May 4, 1947, instead of May 4, 1927. We have not found nor has counsel called to our attention any law or decision in which this question has been raised. When we consider the very large number of ordinances which have been passed by all the municipalities in the country it would seem most probable that such errors must have happened in many instances in the past. The fact that there have been found no statutes or decisions concerning such errors argues their unimportance. However, there is a presumption, no matter how unjustified or extravagant, that everyone knows the law. Even though, through error, the wrong date is inserted in such a case, the correct reference could quickly and easily be learned by communicating with the borough solicitor. The presumption is in favor of

the validity of a borough ordinance and it is, therefore, our opinion, and we hold, that this ordinance is not invalid because of the typographical error made in citing the statute authorizing the ordinance.

Counsel for the borough argues that if our decision is in favor of defendant it would, in effect, be an official court sanction and encouragement to violate the borough's uncontested building ordinance. We do not accept this view. In the first place, the building ordinance is not here in issue. We do not consider the evidence in regard to the failure to obtain a building permit as material here. In the second place, we assume the building ordinance, which was not in evidence, undoubtedly provides for its own enforcement and punishment for its violation. If defendant violated it, the borough should have pursued its remedy under the ordinance. The violation, if any, of that ordinance cannot be considered by the court in a proceeding under an entirely different ordinance. Indeed, instead of a decision in favor of defendant in this case being an official court sanction of the violation of the building ordinance, we are of the opinion that the borough sanctioned the violation by not pursuing the remedy provided by the ordinance.

### Conclusions of Law

1. Paragraph (f) of section 3 of Ordinance no. 343 of the Borough of Ridgway is invalid and void.

2. Defendant's appeal must be sustained.

Accordingly, we make the following

### Order

Now, August 28, 1957, the appeal of defendant, John Bove, is sustained and paragraph (f) of section 3 of Ordinance no. 343 of the Borough of Ridgway is hereby declared invalid and void. The Borough of Ridgway to pay the costs of this proceeding.