**PENNSYLVANIA POWER COMPANY, Appellant**

v.

**TOWNSHIP OF PINE.**

Commonwealth Court of Pennsylvania.

Argued Oct. 18, 2006.

Decided June 18, 2007.

Daniel P. Delaney, Harrisburg, for appellant.

Christian D. Marquis, Pittsburgh, for appellee.

Robert F. Young, Deputy Chief Counsel, Harrisburg, for amicus curiae, Pennsylvania Public Utility Commission.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge COHN JUBELIRER.

This is an appeal from the order of the Court of Common Pleas of Allegheny County (trial court) which, following a *hearing de novo,* dismissed Pennsylvania Power Company's (Penn Power) statutory appeal of the Township of Pine's (Township) denial of Penn Power's application

for a permit to install utility lines along a right-of-way in the Township.[1] Penn Power contends that it has the authority to install five utility poles on the public road right-of-way along Mt. Pleasant Road to provide overhead service. The Township demands that the service be underground.[2]

On January 7, 2002, the Township Board of Supervisors (Supervisors), on recommendation of its Planning Commission, granted approval for the development of Southridge Estates (Development), a residential subdivision consisting of 91 one-acre lots, 16 of which are located within the Township.[3] One of the conditions of the Supervisors' approval was that all utilities be installed underground. (Supervisors Meeting Minutes, January 7, 2002 (Township Ex. 9) at 18; Reproduced Record (R.R.) 834a.)

On May 28, 2002, the Township entered into a Developer's Agreement with Bayard Development Company (Developer), which memorialized the conditions of approval. The Developer's Agreement provided that "Developer ... shall cause all existing utility service lines and all new utility service lines for and to the Development to be relocated underground or situate underground respectively" and that "[n]o additional utility poles shall be installed in Pine (either on or off the Development's site) to service this Development." (Developer's Agreement Between the Township and Developer, May 28, 2002 (Township Ex. 10) at 5–6; R.R. at 842a–843a.) Penn Power was not a party to the Developer's Agreement.

Because the existing lines were inadequate to service the Development, Penn Power developed a new plan to deliver electricity to the Development from its substations. Penn Power filed an application, dated March 21, 2003, for a street opening[4] permit in order to place five wooden poles for an overhead main feeder electric distribution line within Township's road right-of-way along Mt. Pleasant Road.[5] (Street Opening Permit Application, March 21, 2003 (Penn Power Ex. 3) at 1; R.R. at 339a.) The application for a permit was denied in a letter written by Scott Anderson (Anderson), AICP, Director of Code Administration and Land Development in the Township, and directed to Bart Spagnola (Spagnola), Cranberry Township Area Manager for Penn Power.[6]

1. The Township is a Second Class Township and a Home Rule Municipality having adopted its home rule charter on November 5, 1991. The charter is codified at 302 Pa. Code §§ 37.1–101 to 37.12–1205.

2. On May 2, 2007, Penn Power filed an Application for Post–Submission Communication, requesting that the Opinion and Order of the Pennsylvania Public Utility Commission (PUC) in *Robert J. Brunn v. Pennsylvania Power Company*, Commission Dkt. No. C–20066209, 2007 WL 1341387 (order entered April 25, 2007), be received as a post-submission communication in this appeal. The Township filed no response, and Penn Power's application was granted by order dated May 23, 2007. The PUC's *Brunn* opinion addresses electric service requirements *at essentially the same location* which is the site of the dispute in this appeal, and addresses issues related to those presented in this appeal.

3. The remaining lots in the Southridge Estates (Development) are located in Cranberry Township.

4. "Street opening," in this context, refers to the process by which the material on and below the surface of a street or road is excavated. Township Code, Chapter 72 ("Pine Township Excavation, Construction, Maintenance and Standards Ordinance for Roads, Streets and Driveways"), Article 5 ("Excavation of Streets, Tunneling").

5. Penn Power only has overhead *main* feeder distribution lines and does not maintain any underground *main* feeder distribution lines. It does maintain underground *secondary* lines in accordance with Public Utility Commission (PUC) regulations. *See* 52 Pa.Code § 57.82.

6. On April 25, 2003, Penn Power submitted an additional application for a street opening permit on Mt. Pleasant Road for one under-

(Letter from Anderson to Spagnola, April 24, 2003 (Penn Power Ex. 4); R.R. 343–344a.) Anderson provided five reasons for this denial, including Penn Power's failure to provide underground service for the Development pursuant to a Developer's Agreement.

Penn Power then obtained an easement on the corner of Franklin Road and Mt. Pleasant Road from a private property owner. This allowed Penn Power to construct an overhead main feeder distribution line from its existing line to a location where a secondary line dipped under Mt. Pleasant Road and continued into the Development.[7] After receiving Township approval for a street opening permit to place the underground secondary line, Penn Power began delivering electrical service to the Development by means of this one connection. However, because Penn Power established only one connection into the Development, it was unable to establish a desired "loop feed."[8] According to Penn Power, a "loop feed" is required to satisfy its statutory obligation to provide "adequate, safe and reasonable" electrical service to its customers pursuant to Section 1501 of the Public Utility Code, 66 Pa.C.S. § 1501. (Penn Power Br. at 6–7.)

Therefore, in order to place a second underground line and establish a "loop feed," Penn Power again submitted an application to the Township on October 27, 2003, for a permit to place five wooden poles for an overhead main feeder distribution line in the Mt. Pleasant Road right-of-way. (Street Opening Permit Application, October 27, 2003 (Penn Power Ex. 7) at 1; R.R. at 355a.) The application provided the following description of the work: "[i]nstall aerial and underground facilities as shown on attached drawing." (Penn Power Ex. 7 at 1; R.R. at 355a.) It also provided:

> The overhead line extension along Mt. Pleasant Road will include (5) wood pole structures and (5) spans of primary wire. It will begin at the terminus of the existing line and extend eastward past the entrance of South Ridge Drive where it will terminate as an underground riser. This extension will allow a "loop" feed to be established within the South[r]idge Estates residential plan. With the loop configuration, Penn Power will be able to make restoration to any outage within the development by isolating the problem and redirecting the electrical power via switching operations. This will greatly reduce outage time by permitting us to restore service before we make repairs. In the present configuration, we must make repairs prior to restoring service to our customers. The mandate of the Pennsylvania Public Utility Commission is that Penn Power delivers reliable electric service. This line extension will help make that possible.

(Attachment to Penn Power Ex. 7; R.R. at 356a.)

On November 19, 2003, the Township again denied Penn Power's application for

---

ground road crossing for electric facilities (Street Opening Permit Application, April 25, 2003 (Penn Power Ex. 3) at 1; R.R. 348a–354a). This request did not void the request submitted on March 21, 2003; Penn Power expected approval of both.

7. Overhead installation of a main feeder line extension involves placing five poles and extending the existing lines along the newly erected pole line. (Penn Power Br. at 7.)

8. A "loop feed" allows Penn Power to bring power into the Development from two different directions. According to Penn Power, it is a "standard design practice ... for developments of 25 lots or more which allows it to provide the most reliable service possible, consistent with Penn Power's written distribution engineering practices, as well as its statutory mandate to provide reliable service." (Penn Power Br. at 7.)

a permit. The denial letter, which was signed by Anderson, listed six reasons for the denial:

1. The supplemental information provided states that the proposed above ground poles and power line will allow a "loop" feed to be established *"within the Southridge Estates residential plan."* The Southridge Estates plan is a subdivision containing a total of ninety-one (91) lots, sixteen (16) of which are located within the Township of Pine. This number of lots exceeds the number requiring this service line to be installed underground. {emphasis added}

2. The drawing submitted with the application shows that the proposed service line is requested along the frontage of the Bruun plan of lots. The Bruun Plan of lots is a duly recorded subdivision plan, which by the Public Utility Commission Charter requires service lines to be placed underground.

3. The Township has entered into an agreement with the developer of the Southridge Estates plan which states *"It is specifically agreed by Developer that it shall cause all existing utility service lines and all new utility service lines for and to the Development to be relocated underground or situate underground, respectively. No additional utility poles shall be installed in Pine (either on or off the Development's site) to service this Development."* {*emphasis added* }

4. On the plan submitted as a part of the application, note (25) states *"All utilities shall be located underground."* {emphasis added}

5. On the plan submitted as a part of the application, a handwritten note has been copied onto the sheet which states "Request includes tree removal necessary for clearance to overhead lines". No specific information has been included to show which trees, the quantity of trees, or if specimen trees or trees within the Township designated greenway are proposed to be removed as part of the application in violation of the Township Code.

6. The Township has a duly adopted Park, Open Space and Trail plan, and a trail is indicated for installation along Mount Pleasant Road. The submitted information lacks specific information so as to determine if the requested installation of the poles will interfere with the proposed trail.

(Letter from Anderson to Penn Power (November 19, 2003) (Penn Power Ex. 8) at 1–2; R.R. at 359a–360a.) After receipt of the denial letter, Penn Power sought relief from both the Public Utility Commission (PUC) and the trial court.

Penn Power filed a Motion for Declaratory Order (Motion) with the PUC seeking a declaratory order that the Township had no authority to direct that utility lines placed *in a public right-of-way* be installed underground. The Township filed an answer to Penn Power's motion and filed a motion to dismiss. The PUC issued an order, agreeing with Penn Power that the Township should not have cited to Section 57.82 of the PUC's regulations, 52 Pa. Code § 57.82, to support its arguments; it noted that this section only applied to distribution and service lines installed under an application for electric service *within a development*, and did not apply to an electric distribution line located *in a public right-of-way*. It noted, however, that Section 57.84 of the PUC regulations, 52 Pa. Code § 57.84, required that 100 feet of the distribution line supplying the new residential development be placed underground, if practicable. The PUC explained: "[b]ecause Penn Power's distri-

bution line will provide electric service to a new residential development where customer service lines are required to be placed underground, Penn Power must install underground 100 feet of this new distribution line nearest to the boundary of the development." (PUC Order, February 12, 2004 (Township Ex. 1) at 5; R.R. at 488a.) The PUC concluded, however, that it was "not clear" where "the end of the existing distribution line" was located in relation to the subdivision; therefore, it could not readily be determined which 100 foot segment of the line, if any, was required to be installed underground. (Township Ex. 1.) Because there were outstanding issues of fact, and the controversy could not be terminated or uncertainty eliminated by the issuance of a declaratory order, *see* 66 Pa.C.S. § 331(f), the PUC dismissed Penn Power's Motion.[9]

In an effort to "move matters along," however, the PUC attempted to "isolate for the parties the precise legal and factual issues that must be addressed to resolve this matter...." (Township Ex. 1 at 5–6; R.R. at 488a–489a.) It clearly stated that Penn Power had a legal right to occupy and construct utility facilities in this right-of-way. It noted, however, that the question of "whether the Township's permit conditions are reasonable (including its alleged stated preference for Penn Power's distribution line to be placed underground)," was outside its jurisdiction and, ultimately, for the *courts to determine.* (Township Ex. 1 at 6; R.R. at 489a.)

In addition to filing a motion with the PUC, Penn Power also appealed the Township's denial of its permit application to the trial court, which conducted four days of hearings. Penn Power offered the testimony of numerous witnesses. Its Area Manager, Spagnola, distinguished a main feeder line[10] from secondary distribution lines, and explained why it was not feasible or practicable for Penn Power to install its main feeder distribution lines, such as the one proposed to be placed on the Mt. Pleasant Road right-of-way, underground.[11] According to Spagnola, installa-

---

9. The PUC is authorized to issue declaratory orders pursuant to Section 331(f) of the Code which provides: "[t]he commission with like effect as in the case of other orders, and in its sound discretion may issue a declaratory order to terminate a controversy or remove uncertainty." 66 Pa.C.S. § 331(f).

10. Before the trial court, Spagnola described a main feeder line as a line that "carries a significant amount of power down the highway that gives us the ability to tap off that feeder to pick up homes or businesses on side streets or to go into developments, feed the development and also continue on down the highway to continue feeding future developments." (Notes of Testimony (N.T.) at 9; R.R. at 9a.)

11. On direct examination, Spagnola explained:

> Q. And does a main feeder distribution line differ in any way from a secondary distribution line that actually goes into a development or hooks into a home?

A. Yes. Normally the cable is very large.... The distribution line going into developments are ... significantly smaller....

Q. If a main feeder distribution line has a fault or goes out, what is the result of that?

A. That would take everything out beyond the fault.

\* \* \* \*

Q. Now, with respect to the secondary distribution lines that come off of that main feeder line and go into, in this case, subdivisions, are those routinely placed underground or overhead? By those I mean the secondary lines that come off the main feeder lines.

A. Yes. According to the Pennsylvania Code for public utility, any recorded development of five lots or more will have all underground services within the development.

Q. So those secondary lines that we are talking about in subdivisions, by statute, are all underground?

tion of the main feeder distribution line underground requires a costly and complicated installation.[12] Andy Sagulla, a Penn Power distribution specialist for thirty-four years, testified that Penn Power does not own the necessary equipment to perform underground maintenance work, and none of its employees have OSHA training for working in closed spaces, which is required for maintenance of an underground main feeder distribution line. (Notes of Testimony, January 19, 2005 (N.T.) at 117, 139; R.R. at 117a, 139a.) Penn Power's New Business Engineering Supervisor, John Wittmann (Wittmann), performed a cost analysis and concluded that it would cost $350,000 to place a main feeder distribution line underground, 1,200 feet from the overhead main feeder line located on the neighboring property owner's land to the western boundary of the Development, as opposed to $30,000 if the same length of line was placed overhead.[13] (N.T. at 187–188; R.R. at 187a–188a.) Wittmann also testified that it was not practicable to install a main feeder line along Mt. Pleasant Road underground because "it would be [a] unique installation to Penn Power. It represents a much greater investment to build and operate that system. [Penn Power does not] have field crews that are trained in the operation and maintenance of that system." (N.T. at 195; R.R. at 195a.)

 The trial court concluded that the Township had the authority to deny the permit to Penn Power for installation of overhead power lines into the Development based on Section 57.84 of the PUC regulations, 52 Pa.Code § 57.84, which requires that distribution lines located within 100 feet of a development be placed underground, if practicable. The trial court found that Penn Power failed to establish that the underground system was not practicable. The trial court cited *Duquesne Light Co. v. Monroeville Borough,* 449 Pa. 573, 298 A.2d 252 (1972), as support for its decision that the Township may define by ordinance a reasonable underground wiring district. Finally, the trial court concluded that the six reasons provided to Penn Power in the Township's

---

A. All underground.
Q. Does Penn Power have a policy regarding the placement of these main feeder distribution lines above or underground?
A. Yes. We have no main feeder lines installed in Penn Power territory underground. All our feeder lines, main feeder lines, are overhead, and we are an overhead distribution company and all our tasks with the Public Utility Commission are based on design, installation and maintenance of overhead lines.
(N.T. at 9–11; R.R. at 9a–11a.)

12. As described in Penn Power's brief, the installation would involve the burial of three cables, each approximately two inches in diameter. The entire length of each of the three underground cables would need to be placed in a four-inch conduit which, itself, would be encased in concrete. Each span of cable would weigh several tons and require a specialized piece of equipment to pull the heavy cable into the conduit. Penn Power would also have to install a second set of three underground cables in the same manner, running parallel to the first, in order to provide redundancy sufficient to provide reliable service to its customers. (Penn Power's Br. at 8 (citations omitted).)

13. At the time Penn Power's permit application was submitted, Wittmann testified it would cost approximately $650,000 to install an underground main feeder distribution line 2,800 feet from the beginning of Freeport and Franklin Roads to the entrance of the Development. In comparison, Wittmann estimated that it would cost approximately $60,000 to install the five poles and mount the lines overhead. (N.T. at 153–154, 161–162; R.R. at 153a–154a, 161a–162a.) Since the time of its application, Penn Power obtained an easement from a neighboring property owner and placed an overhead main feeder line over his property. The numbers included above utilize this new starting point.

denial letter were "clear and distinct" and "comprehensive." (Trial Ct. Op. at 17.) Penn Power appealed the trial court's decision to this Court.[14]

On appeal, Penn Power raises five issues; however, because of our disposition in this case, we reach only the first two.[15] We must determine whether the trial court erred when it found that: (1) the Township was authorized to regulate electric utilities by requiring underground installation of a main feeder distribution line within the road right-of-way, and that (2) the underground installation of the main feeder distribution line was required by the PUC regulations. Oral argument was held on January 30, 2006, before a three-judge panel of this Court.[16] On June 30, 2006, this Court informed the parties that the matter was to be argued en banc in October 2006.[17]

## I.

The trial court cited the *Duquesne Light* case as support for its decision that the Township was authorized to regulate electric utilities by requiring underground installation of a main feeder distribution line within the road right-of-way.

In *Duquesne Light,* our Supreme Court addressed how to reconcile conflicts when a local government and the PUC have overlapping statutory authority. The question in the case was whether the Borough of Monroeville (Borough) correctly applied The Borough Code[18] when it enacted an ordinance prohibiting the installation of new overhead wires, cables and

14. This Court's standard of review of a statutory appeal where the trial court has conducted a *hearing de novo* is whether the trial court's findings were supported by substantial, competent evidence, whether errors of law were committed, and whether the trial court's determinations demonstrated a manifest abuse of discretion. *Commonwealth v. Baldwin,* 767 A.2d 644 (Pa.Cmwlth.2001).

15. The remaining three issues are: (1) whether the trial court erred when it found that the Township's Developer's Agreement could be enforced against Penn Power to mandate how it provides electrical service; (2) whether the trial court erred when it found that the Township's other stated reasons for the denial of *the application were sufficient to support a* denial; and (3) whether the trial court abused its discretion when it excluded evidence necessary to rebut the Township's bases for the permit application denial.

16. Both the PUC and the Energy Association of Pennsylvania filed Amicus Curiae Briefs and Supplemental Briefs in support of Penn Power.

17. Prior to en banc argument, the parties were ordered to prepare responses to the following two questions:

I. Whether Pine Township has the power to order an electric utility to place lines needed to provide service to [a] subdivision [underground,] where all the lines in the subdivision are underground? If so, does Pine Township have to enact an ordinance to require the utility lines ... be placed underground or can they require utilities to be placed underground as part of the permit process? See 53 P.S. § 1991.

II. Once a municipality has ordered that an electric utility place lines leading to a subdivision underground, before that order is *implemented, does the* Pennsylvania Public Utility Commission have sole jurisdiction to determine whether the line is "practicable"? See 52 Pa.Code § 57.84; *Duquesne Light Company v. Borough of Monroeville,* 449 Pa. 573, 298 A.2d 252 (1973).

(Order of Commonwealth Court, June 30, 2006 (Colins, P.J.).)

18. Act of February 1, 1966, P.L. (1965) 1656, *as amended,* 53 P.S. §§ 45101–48501. Section 2301 of The Borough Code, 53 P.S. § 47301. Section 2301 provides:

Any borough may define, by ordinance, a reasonable district within which electric light, electric power, telephone, telegraph and other types of wires shall be placed underground in conduits, owned and constructed either by the borough or by corporations owning such wires, or by corporations organized for the purpose of laying such conduits and renting space therein.

supporting poles and requiring the removal of existing overhead equipment by relocation or placement underground, *or,* whether the power to compel the placement of electrical wires underground was preempted by the Public Utility Code. *Id.* at 576, 298 A.2d at 254.

Duquesne Light maintained overhead power lines in one of the Borough's districts and was notified by the Borough to remove those wires and supporting poles, and to relocate them underground. Duquesne Light refused to relocate its wires and, together with the PUC, filed an appeal arguing that The Borough Code was preempted by the Public Utility Code, which gave the PUC general regulatory powers. The trial court dismissed the appeal, thus sustaining the validity of the Borough's ordinance and the reasonableness of the underground wiring district created by the ordinance.

On appeal, the Supreme Court recognized "[t]his Court has consistently held ... that the Public Utility Commission has exclusive regulatory jurisdiction over the implementation of public utility facilities." *Id.* at 580, 298 A.2d at 256. It cited *York Water Co. v. York,* 250 Pa. 115, 118, 95 A. 396, 397 (1915), for the proposition that:

> There can be no reasonable doubt that the legislative intention was to make the Public Service Act (precursor to the Public Utility Code) the supreme law of the state in the regulation and supervision of public service corporations, and, this being so, it follows as a necessary sequence that all laws inconsistent with

the powers thus conferred must be held to be repealed or supplied thereby.

*Duquesne Light,* 449 Pa. at 580, 298 A.2d at 256. The Court also noted, however, that the Borough's ordinance creating the underground wire district was enacted pursuant to the specific power conferred upon boroughs by the General Assembly in The Borough Code.

The Court then engaged in a preemption analysis to resolve a perceptible conflict between the two statutes. The Court recognized the authority vested in the Borough pursuant to the provisions of The Borough Code, but noted that the Borough could "only effectuate its purpose by initially proceeding before the PUC." *Id.* at 580–581, 298 A.2d at 256–57. Stating that The Borough Code and the Public Utility Code were to be read together to give effect to both, the Supreme Court concluded that the Borough had authority to define reasonable wiring districts—*however*—the PUC had exclusive regulatory jurisdiction over the implementation of public utility facilities and was the proper forum for adjudication of the particulars of implementation, including timing, feasibility, and cost of the project.

The trial court, thus, misinterpreted the holding in *Duquesne Light* when it applied it to the facts at issue here. The case neither expanded the authority of local government bodies over public utilities, nor diminished the authority of the PUC. It simply reconciled two conflicting statutes and reaffirmed the long line of decisions in this Commonwealth establishing that a municipality may not, through ordinance or otherwise, *compel* the underground installation of electric utilities.[19]

---

19. *See County of Chester v. Philadelphia Elec. Co.,* 420 Pa. 422, 218 A.2d 331 (1966) (holding that regulation by a multitude of jurisdictions would result in "twisted and knotted" public utilities with consequent harm to the general welfare); *Duquesne Light Co. v. Upper St. Clair Twp.,* 377 Pa. 323, 105 A.2d 287 (1954); *Newtown Twp. v. Philadelphia Elec. Co.,* 140 Pa.Cmwlth. 635, 594 A.2d 834, 837 (1991) (noting that "it is clear that no 'implied' power exists in the MPC which would allow the Township to regulate [the Philadelphia Electric Company] through its subdivision and land development ordinance"); *Heintzel v. Zoning Hearing Bd. of Millcreek Twp.,* 111 Pa.Cmwlth. 263, 533 A.2d 832 (1987) (holding that township had no power to regulate, under its zoning ordinance, city's

Here, the Township never passed an ordinance or regulation pursuant to its home rule powers that would require a utility to place its lines underground. Instead, the Township relied upon its authority to issue permits under 53 P.S. § 1991, the Act of May 11, 1911, P.L. 244, § 18, *as amended*, (Section 1991), to require Penn Power to place its lines underground. Section 1991 authorizes municipalities to issue permits to determine the manner in which public utilities must place their equipment on, over, or under their streets. Section 1991 provides, in pertinent part:

> The proper corporate authorities of such municipality shall have the right to issue permits determining the manner in which public service corporations ... shall place, on or under or over such municipal streets or alleys, ... pipes, conduits, telegraph lines, or other devices used in the furtherance of business; and nothing herein contained should be construed to in any way affect or impair the rights, powers, and privileges of the municipality in, on, under, over, or through the public streets or alleys of such municipalities, except as herein provided.

53 P.S. § 1991.

The permit powers described in Section 1991 are not unlimited, however, because Section 1991 has been repealed insofar as it is inconsistent with Section 1511 of the Business Corporation Law of 1988(BCL),[20] 15 Pa.C.S. § 1511. Section 1511, entitled "Additional Powers of Public Utilities," provides utilities with the right to occupy roads and streets for the placement of underground utilities:

**(a) General rule.—A public utility corporation shall,** in addition to any other power of eminent domain conferred by any other statute, **have the right to take, occupy** and condemn **property** for one or more of the following principal purposes and ancillary purposes reasonably necessary or appropriate **for the accomplishment of the principal purposes:**

\* \* \* \* \* \*

(2) **The transportation of** artificial or natural gas, **electricity,** petroleum or petroleum products or water or any combination of such substances for the public.

\* \* \* \* \* \*

**(e) Streets and other public places.— A public utility corporation shall have the right to enter upon and occupy streets,** highways, waters and other public ways and places for one or more of the principal purposes specified in subsection (a) and ancillary purposes reasonably necessary or appropriate **for the accomplishment of the principal purposes,** *including the placement, maintenance* **and removal** *of* **aerial, surface** and subsurface *public utility facilities thereon or therein.* Before entering upon any street, highway or other public way, **the public utility corporation** *shall obtain such permits as may be required by law* **and** *shall comply with the lawful and reasonable regulations of the governmental authority having responsibility for the maintenance thereof.*

---

erection of water tower because that power was under the exclusive jurisdiction of the PUC); *South Coventry Twp. v. Philadelphia Elec. Co.,* 94 Pa.Cmwlth. 289, 504 A.2d 368 (1986) (noting that to possibly subject [the Philadelphia Electric Company] to a miscella- neous collection of regulations upon its system would clearly burden and indeed disable it from successfully functioning as a utility).

**20.** *See* Section 302(d) of the Act of December 21, 1988, P.L. 1444, effective October 1, 1989.

(Emphasis added and in original.) The Amended Committee Comment—1990 to Section 1511 of the BCL explains:

> [R]eference in the last sentence of subsection (e) to "permits" is a codification of the prior law **relating to the time and manner of opening a street**, etc., and is not intended to imply a power to decide whether or not, and by whom, a type of utility service may be offered by means of the contemplated facilities. *See generally* Zeiter, "A Comparison of the Pennsylvania Business Corporation Law and the New Delaware Corporation Law in Light of the 1968 Revision of the Pennsylvania Law," 74 Dick. L.Rev. 1, 40–52 (1969).

In Zeiter's article, he notes that permits and reasonable regulations imposed by the township having authority for maintenance of a street or highway refer only to matters of local concern. 74 Dick. L.Rev. at 47. These matters include "the manner in which the street or highway is opened, back-filled, repaved, etc., the length of time that the excavation is open, the length of trench opened at one time, the hours of excavation, etc." *Id.* Zeiter notes that the General Assembly passed acts regarding public utilities "with the implied understanding that the public utility corporation would be subject to local street occupancy regulations." *Id.* at 48. However, Zeiter also noted:

> It is settled in the law of Pennsylvania that those subjects which are committed to the discretion of the [PUC] are removed from the jurisdiction of other governmental agencies. It has been clear to most careful observers that all existing statutory provisions relating to "consent" authority in local political subdivisions have been supplied, and hence repealed, by the Public Utility Law [21] and its predecessor legislation to the extent that such provisions purport in terms to vest general business authorization or "certificate" powers with respect to public utilities in political subdivisions.

*Id.* at 50 (footnotes omitted).

■ As in *Duquesne Light,* where The Borough Code and the Public Utility Code needed to be construed together, here, Section 1991 and Section 1511 of the BCL need to be construed together, along with the Public Utility Code, to give effect to all. Section 1991 gives the Township the authority to issue a permit determining the manner in which Penn Power places distribution lines on, over, or under its streets; *however,* the scope and breadth of that permit authority have been limited by Section 1511 of the BCL to matters of local concern, such as those previously described above.[22] Because the underground installation of a distribution line within the Township's right-of-way is not, by statutory definition, a matter of local concern, the Township has no authority to require Penn Power to proceed in that fashion. The decision whether to place a distribution line underground remains solely with the public utility (Penn Power), which, pursuant to Section 1511 of the BLC, and appro-

---

21. The Public Utility Law of 1937, Act of May 28, 1937, P.L. 1053, was repealed by the Public Utility Code, 66 Pa.C.S. §§ 101–3316.

22. Here, Section 72–21 of the Township's Code requires that a permit be obtained before any street is opened or excavated. The "manner in which" a street is opened is governed by Section 72–26 of the Township's Code. That section sets forth the conditions the Township may impose to secure the convenience and safety of the traveling public and protect the Township against damages it might otherwise sustain by reason of construction, maintenance, and operation by the public utility upon its streets. Those conditions relate to drainage, methods of backfilling, temporary paving, surface and subsurface support requirements, as well as set back requirements and road restoration provisions.

priate sections of the Public Utility Code, has the right to enter upon any township road to accomplish its purpose of transporting electricity for the public, whether that be on, over, or under township streets. 15 Pa.C.S. § 1511(a)(2). Accordingly, the trial court erred when it held that the Township had the authority to order an electric utility to place lines needed to provide service to the Development underground.

## II.

The second issue we must address is which entity has jurisdiction to determine whether placement of an underground utility line is "practicable." Section 57.84 of the PUC regulations provides:

> § 57.84. Installing distribution lines beyond boundary of development. Whenever the distance from the end of the utility's existing distribution line to the boundary of the development is 100 feet or more, the 100 feet of new distribution line nearest to but outside the boundary shall be installed underground if practicable; and whenever the distance is less than 100 feet from the boundary, all of the new distribution line nearest to but outside the boundary shall be installed underground if practicable.

52 Pa.Code § 57.84.[23]

■ As noted, our Supreme Court's holding in *Duquesne Light* reaffirmed the exclusive jurisdiction of the PUC to determine, in the context of a municipality's redevelopment project, matters related to the design, location, installation, and maintenance of public utility facilities. As stated in the concurring opinion:

> Any other determination would clearly signal the end of unified utility regulation within the Commonwealth. The

practical effect of allowing the Borough of Monroeville to compel public utilities to relocate their existing overhead wiring would be to permit a borough, free from any statewide considerations or prior approval by the [PUC], to require, as in this instance, the expenditure of over $1,000,000 by public utilities. Obviously these and similar expenditures would become part of the utilities' rate base, and accordingly, would be reflected in increased consumer rates. It is equally obvious that to permit these higher rates to be imposed on consumers outside of the borough would be in effect allowing the borough, by its unilateral action, to influence rates outside its geographic boundaries.

*Duquesne Light Co.,* 449 Pa. at 583, 298 A.2d at 258 (footnote omitted).

The "initial and exclusive authority" of the PUC to first determine public utility regulatory matters, as it did in *Duquesne Light* regarding whether an underground wiring district should become operative, 449 Pa. at 582, 298 A.2d at 257, has long been the law of this Commonwealth. As long ago as 1954, the Supreme Court succinctly explained in *Upper St. Clair Township:*

> It is clear that the proposed transmission line is necessary for the rendition of efficient service to the public and that that necessity transcends the legitimate objectives of any one of the political subdivisions of the Commonwealth. We believe that this is the reason why the General Assembly entrusted the regulation of public utilities to a commission of statewide jurisdiction. Local authorities not only are ill-equipped to comprehend the needs of the public beyond their jurisdiction, but, and equally important,

---

**23.** Penn Power's proposed new distribution line runs parallel to Mt. Pleasant Road, and therefore, *may* be within 100 feet from the boundary of the Development. (Construction Plan, Southridge Estates Plan of Lots, (Attachment to Penn Power's Ex. 7); R.R. 358a.)

those authorities, if they had the power to regulate, necessarily would exercise that power with an eye toward the local situation and not with the best interests of the public at large as the point of reference. We believe that the General Assembly never intended to bestow a power upon first class townships which is in headlong conflict with the power already given the Public Utility Commission. . . .

Any other conclusion than that reached by the chancellor would render the Public Utility Commission powerless to regulate the functioning of an electric service company if in so doing the Commission contravened any regulation or order of a local zoning authority. If the power of the municipality were held paramount, the Commission could not compel the utility to provide adequate service or in anywise control the expansion or extension of the utility's facilities if an order of the Commission conflicted with action taken by any political subdivision of the State. This would mean the complete negation of the powers of regulation and control specifically given as a matter of public policy to the Public Utility Commission in the interest of state-wide public welfare.

*Duquesne Light Co. v. Upper St. Clair Twp.*, 377 Pa. 323, 335–336, 105 A.2d 287, 293 (1954). In *County of Chester v. Philadelphia Electric Company*, the Supreme Court further explained:

The necessity for conformity in the regulation and control of public utilities is as apparent as the electric lines which one views traversing the Commonwealth. If each county were to pronounce its own regulation and control over electric wires, pipe lines and oil lines, the conveyors of power and fuel could become so twisted and knotted as to affect adversely the welfare of the entire state. It is for that reason that the Legislature has vested in the [PUC] exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utility facilities.

420 Pa. 422, 425–26, 218 A.2d 331, 333 (1966). And, as this Court explained in *South Coventry Township v. Philadelphia Electric Company*, 94 Pa.Cmwlth. 289, 504 A.2d 368, 371 (986), "to possibly subject [the utility] to a miscellaneous collection of regulations upon its system would clearly burden and indeed disable it from successfully functioning as a utility."

By concluding that it was "practicable" for Penn Power to install its electric lines underground, the trial court exceeded its authority. As *Duquesne Light* instructs, the ultimate authority to determine the particulars of implementation, including feasibility and cost of the project, are for the PUC to decide, not our common pleas courts when reviewing a denial of a street opening permit.

For the foregoing reasons, the trial court erred when it concluded that the Township lawfully denied Penn Power's application for a street opening permit to install the overhead utility line. It also exceeded its jurisdiction when it decided the issue of practicability. Accordingly, we vacate the order of the trial court, and transfer this case to the PUC to determine the issue of practicability under Section 57.84 of the Public Utility Code.

### ORDER

**NOW,** June 18, 2007, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is hereby vacated and this matter is transferred to the Public Utilities Commission for its review consistent with this opinion.

Jurisdiction relinquished.

## CONCURRING AND DISSENTING OPINION BY Judge McGINLEY.

The majority concludes, and I agree that Pine Township did not have the authority to require Penn Power to install its main distribution feeder line underground. I do not agree that this case should be vacated and transferred to the Commission. Instead, the trial court must be reversed and the matter remanded to the trial court to remand to Pine Township for issuance of a street opening permit to Penn Power.

This case was commenced when Penn Power filed a street opening permit with Pine Township in order to place five wooden poles for an overhead main feeder electric distribution line within Pine Township's public road right-of-way along Mt. Pleasant Road. Penn Power proposed in its permit application to place an overhead main feeder distribution line along the *south* side of Mt. Pleasant Road to connect Southridge Estates on the *north* side of Mt. Pleasant Road. Pine Township denied the application because *the developer* agreed "to cause" all existing and new utilities service lines on and off the site to be installed underground and the Board of Supervisors' approval of the subdivision plan was contingent on underground utility lines and other conditions. The trial court affirmed Pine Township because it "was consistent with" PUC regulations 52 Pa. Code § 57.82 and § 57.84 and because the trial court concluded it was "practicable" for Penn Power to install the line underground.

Pine Township's denial of the permit was not based on reasonable criteria ordinarily examined in reviewing street opening permits. First, the trial court erred when it relied on language contained in a third party developer's agreement to support its decision to uphold the denial of the permit by Pine Township. Penn Power, a regulated public utility, was not a party to that agreement. As provided in the Public Utility Code, the Commission has exclusive jurisdiction over the implementation of public utility facilities. 66 Pa.C.S. § 501(b). Pine Township may not alter the exclusive jurisdiction of the Commission over public utilities by language incorporated in a document for land subdivision and development to which a utility was not a party. This Court has held that a township may not alter the exclusive jurisdiction over public utilities through its zoning and subdivision regulations. *Newtown Township v. Philadelphia Electric Co.*, 140 Pa.Cmwlth. 635, 594 A.2d 834 (1991). Thus, Pine Township has no authority to alter the exclusive jurisdiction of the Commission based on a development agreement with a contractor. The trial court erred as a matter of law when it held Penn Power to the terms of the agreement which provided "all utilities must be underground."

Additionally, the Township's decision, affirmed by the trial court, was based upon a misinterpretation of the PUC regulations. The trial court erroneously relied on Section 57.82 of the regulations, which apply to electrical lines *within* a development. Penn Power's proposed overhead electrical lines are in a public right-of-way, not *within* the development.

The trial court also apparently believed that Section 57.84 provided for a 100 foot buffer zone surrounding a development in which all electrical lines must be installed underground. According to the Commission, this is not the case. Only the 100 feet of line *feeding into the development* must be installed underground, if practicable.

> Whenever the distance from the end of the utility's existing distribution line to the boundary of the development is 100 feet or more, the 100 feet of new distribution line nearest to but outside the boundary shall be installed underground if practicable; and whenever the dis-

tance is less than 100 feet from the boundary, all the new distribution line nearest to but outside the boundary shall be installed underground if practicable. The installation required by this section shall be provided by the utility, without cost to the applicant.

52 Pa.Code § 57.84. As indicated in the Commission's order, it is only the portion of the distribution line nearest to the development (in other words, the line that feeds into the development) that must be installed underground.

By upholding Pine Township's denial of the permit application, the trial court allowed Pine Township to supervise and control the operations of Penn Power by "conditioning" the street opening permit on the placement of a main distribution feeder line parallel to the development along Mt. Pleasant Road underground.

I recognize that the Commission has primary jurisdiction over public utilities including the issue of practicability. But plainly, the Commission does not have jurisdiction of an appeal from the denial of a permit application and this Court may not confer jurisdiction on the Commission by transferring the controversy. Critically, the Commission's answer to the question of "practicability" is not necessary to resolve Penn Power's right to obtain a street opening permit. The central issue in this appeal is not whether it was practicable or possible for Penn Power to place the main feeder distribution line underground under applicable PUC regulations; the only issue this Court must decide is whether the trial court erred in giving Pine Township the authority to dictate to Penn Power that it must install its main distribution feeder line underground.

By vacating the trial court's order and transferring "this case" to the Commission to determine if Section 57.84 of the Pa. Code applies, the majority has, in essence, *sua sponte* expanded the nature of the underlying dispute and gone beyond the relief requested. The trial court's role was to determine whether Pine Township had the authority to condition the permit on the main distribution feeder line being placed underground. The trial court's action with respect to the denial of the permit application having been in error ends the inquiry. Which portion, if any, of Penn Power's main distribution feeder line must be installed underground, based upon whether the distance from the end of its existing distribution line to the boundary of Southridge Estates is under 100 feet, is a collateral issue best left to be raised at the appropriate time and manner, if necessary.

Section 57.84 of the Pa.Code is unequivocal. *If* the distance from the end of Penn Power's existing distribution line to the boundary of the development is 100 feet or more, then Penn Power must put it underground unless not practicable. *If* Penn Power believes it is not practicable, then the proper procedure is for *Penn Power* to commence a separate action before the Commission on the issue of practicability. Penn Power should be permitted to chart its own course.

Based on the foregoing, I dissent because I do not believe this Court has the authority to transfer the controversy to the Commission.

### DISSENTING OPINION BY Judge SMITH–RIBNER.

I respectfully dissent from the decision to vacate the order issued by the Allegheny County Court of Common Pleas, dismissing the statutory appeal by the Pennsylvania Power Company (Penn Power) from a decision of the Township of Pine (Township) to deny Penn Power's application for a "street opening permit," and to transfer this case to the Public Utility Commission. As indicated, the Township and the Southridge Estates developer en-

tered into an agreement May 28, 2002 requiring "all existing utility service lines and all new utility service lines for and to the Development to be relocated underground or situate underground" and stating that "no additional utility poles shall be installed in Pine to service this Development." The Township approved the development plan (91 lots with 16 in the Township) providing that "all utilities shall be located underground." Penn Power proposed to install 5 wooden poles for overhead electric lines on the right-of way of Mt. Pleasant Road allowing for a "loop feed" within the development.

Before the trial court, Penn Power presented testimony to show that all of its main feeder distribution lines were overhead; that installation of a main feeder line underground would be costly; and that it did not have trained personnel to install, maintain and repair an underground service line. The projected cost for installing an underground service line was $350,000 as compared to $30,000 for installing an overhead service line. The trial court rejected Penn Power's claim that it could not install the line underground and dismissed its argument that installation was not "practicable" under 52 Pa.Code § 57.84, which provides:

> Whenever the distance from the end of the utility's existing distribution line to the boundary of the development is 100 feet or more, the 100 feet of new distribution line nearest to but outside the boundary shall be installed underground if practicable; and whenever the distance is less than 100 feet from the boundary, all of the new distribution line nearest to but outside the boundary shall be installed underground *if practicable.* The installation required by this section shall be provided by the utility, without cost to the applicant.

The trial court indicated that Penn Power belongs to a compact of utility providers and that it had the means available for the underground installation.

The trial court relied upon *Duquesne Light Co. v. Borough of Monroeville,* 449 Pa. 573, 298 A.2d 252 (1972), holding that, although the Public Utility Commission has exclusive jurisdiction over implementation of the Public Utility Code, boroughs may define by ordinance reasonable underground wiring districts with ultimate authority in the Commission over implementation, including matters such as timing, feasibility and project costs. The trial court concluded that the Township's action is not preempted, and it noted that the Commission declined jurisdiction over Penn Power's request for a declaratory order and that it proposed to place overhead lines on the street right-of-way owned by the Township.

I agree with the Township that the trial court did not err in this matter because the issue of whether conditions imposed by the Township are reasonable is a decision ultimately to be made by the court. The trial court held that Penn Power was subject to 52 Pa.Code § 57.84 and that the Township is not precluded from exercising reasonable discretion in deciding whether to grant or to deny a permit. Moreover, Penn Power never indicated that it could not install the service lines underground; Penn Power was aware of the developer's agreement; Penn Power failed to submit information on the tree removal issue; and it failed to include other pertinent information such as the location of poles and length of the proposed line in violation of Section 72–22(D) of the Township Code. The Township provided testimony that placement of poles near the paved cartway would pose a detriment to the safety of motorists. Regardless of whether the Township had the authority to require the underground installation, Penn Power has failed to meet all of the reasonable requirements of the Township Code. There-

fore, because the trial court neither abused its discretion nor committed an error of law, I would affirm its order dismissing the statutory appeal filed by Penn Power.